FILED

2023 Dec-05  PM 02:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **GRANT SUNNY IRIELE, as the** | ) | |
| **personal representative of the estate** | ) | |
| **of ROSEMARY EWERE IRIELE** | ) | |
| **(a.k.a. Rosemary Ofume),** | ) | |
| | ) | **7:20-cv-383-LSC** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RICHARD CARROLL GRIFFIN,** | ) | |
| **ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OF OPINION

Rosemary Ewere Iriele, also known as Rosemary Ofume, died of a pulmonary infarction while in custody at FCI Aliceville. Grant Iriele, her son and the personal representative of her estate, brought this action against Warden Patricia Bradley, "Officer Jones,"[1] Dr. Richard Griffin, Nurse Elizabeth Knopp, Christopher Potter, and Nurse Jason Etheridge (collectively, when excluding "Officer Jones," the "Individual Federal Defendants") in their individual capacities, alleging deliberate indifference to serious medical needs under the Eighth Amendment, pursuant to the

---

[1] Officer Jones has not been specifically identified in this lawsuit, nor has an attorney for Officer Jones appeared. It appears that "[t]he government is continuing efforts to locate" this defendant. (Doc. 46 at 7 n.3.)

legal standards set forth in *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). He also brought this action against the United States, alleging negligence and wrongful death under the Federal Torts Claims Act ("FTCA").

Presently before the Court are Motions to Dismiss filed by the United States and the Individual Federal Defendants. (Docs. 44, 46.) Also before the Court is the Estate's (hereinafter "Plaintiff") Motion for Leave to File a Second Amended Complaint. (Doc. 51.) The issues have been fully briefed by the parties and are ripe for review. For the reasons discussed below, the United States's Motion to Dismiss is GRANTED. (Doc. 44.) The Individual Federal Defendants' Motion to Dismiss is GRANTED in part and DENIED in part. (Doc. 46.) Plaintiff's Motion for Leave to File a Second Amended Complaint is GRANTED as to the remaining defendants. (Doc. 51.)

## I.   FACTUAL BACKGROUND

In evaluating a motion to dismiss, this Court "accept[s] the allegations in the complaint as true and constru[es] them in the light most favorable to the plaintiff." *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012) (quoting *Ironworkers Loc. Union 68 v. AstraZeneca Pharm., LP*, 634 F.3d 1352, 1359 (11th Cir. 2011)). As all Defendants oppose Plaintiff's Motion for Leave to File a Second Amended Complaint on the ground that further amendment would be futile (Doc. 54

at 6; Doc. 55 at 9), the following "facts" are taken from the allegations contained in both Plaintiff's Amended Complaint and Second Amended Complaint, and the Court makes no ruling on their veracity. These are "facts" for purposes of evaluating the Motions to Dismiss only.

On or near August 24, 2017, Rosemary Iriele (hereinafter "Iriele") had an initial health and intake screen at FCI Aliceville. (Doc. 51-1 ¶ 19.) At this time, she had an elevated pulse rate of 110 bpm. (*Id*. ¶ 19.) She was given a Tuberculin Skin Test ("TST"), despite the fact that she had recently tested positive while confined at Robert A. Deyton Detention Facility (hereinafter "Lovejoy") and it is rare to test negative after a positive result. (*Id*. ¶¶ 20, 22.)

On August 31, 2017, Iriele initiated a sick call visit. (*Id.* ¶ 24.) She believed that she was having an adverse reaction to the TST, and she complained of pain in her extremities. (*Id.*) Her pulse rate was elevated at 102 bpm. (*Id.*) She did not receive treatment. (*Id.*)

On September 13, 2017, Iriele had a scheduled medical examination with Dr. Griffin, who is a physician at FCI Aliceville. (*Id.* ¶ 25.) Although her pulse rate was elevated at 119 bpm, Dr. Griffin did not order any additional testing or provide any treatment. (*Id.*)

Later that month, Iriele was transferred to Lovejoy, where her pulse rate was consistently in the range of 105–110 bpm. (*Id.* ¶¶ 26–27.) She was later returned to

Aliceville, where she had an initial health screen on March 8, 2018. (*Id.* ¶ 28.) The health screen was performed by Nurse Etheridge and examined and cosigned by Dr. Griffin. (*Id.*) Although her pulse rate was 105 bpm and her records showed the elevated pulse rates from the previous months at Lovejoy, neither Nurse Etheridge nor Dr. Griffin provided treatment for the elevated heart rate. (*Id.*) Further, Iriele expressed that she did not want another TST done at this time; however, she allowed Nurse Etheridge to perform the TST after he allegedly threatened to place her in solitary confinement. (*Id.* ¶ 29.) According to Plaintiff, Etheridge did not document this TST "upon realizing it may have harmed Iriele." (*Id.*) Etheridge later came to Iriele and apologized to her after she filed a grievance against him. (*Id.* ¶¶ 31–32.)

"After the TST administration on March 8, 2018, Iriele became gravely ill." (*Id.* ¶ 33.) She believed that her illness was an adverse reaction to the TST, and she complained that she felt "itchy, dizzy, lightheaded, couldn't walk long distances, and began showing cold like symptoms." (*Id.* ¶ 34.) "[H]er body felt horrible all over." (*Id.*) On March 15, 2018, she went to the prison clinic, where she was evaluated by Health Aide and Technician Potter. (*Id.* ¶ 35.) Despite that she had visible skin irritations and an elevated pulse rate of 104 bpm, Potter did not provide any treatment. (*Id.*) Potter did tell her to get hydrocortisone from the commissary, which she did. (*Id.* ¶ 36.) Potter's examination findings were reviewed by Dr. Griffin. (*Id.* ¶ 35.)

4

From March 15–19, Iriele continued to go to sick call, as her symptoms "dramatically worsened." (*Id.* ¶ 37.) However, according to Plaintiff, Dr. Griffin and the medical staff "failed to respond by investigating the cause of her symptoms." (*Id.*) As Plaintiff describes it, "Griffin and Potter belittled her, turned her away, [] refused to diagnose her or otherwise provide her with medical care" and "accused her of faking illness." (*Id.* ¶ 38.) They did not perform any further medical evaluation during this timeframe. (*Id.*)

On March 19, 2018, Iriele went to sick call, where she was seen by Nurse Knopp. (*Id.* ¶ 39.) Iriele complained of "fever, persistent cough, and nasal congestion," and she had an elevated pulse rate of 113 bpm. (*Id.*) Significantly, she had also lost nine pounds within the last four days. (*Id.* ¶ 42.) Nurse Knopp did not provide any treatment, and this record was reviewed and signed by Dr. Griffin. (*Id.*)

According to Plaintiff, if either Dr. Griffin, Nurse Etheridge, Potter, or Nurse Knopp had properly examined Iriele, they would have recognized her obvious pulmonary emboli symptoms. (*Id.* ¶ 40.) These symptoms are highlighted in the Merck Manual as being "red flags" that "warrant[] immediate medical attention." (*Id.* ¶ 41.)

One of Iriele's fellow inmates recounted that, in the days preceding her death, she could be seen coming out of the medical unit, crying in pain and stating, "they won't do anything to help me." (*Id.* ¶ 47.) On March 20, 2018, Iriele told another

5

fellow inmate that her chest and head hurt, and that the medical staff "doesn't want to do anything to help me." (*Id.* ¶ 48.)

Iriele died on March 21, 2018. That morning, her "condition became so severe that she could not lie down due to severe difficulty breathing and she feared completely losing her breath altogether and dying as a result. Iriele's roommate, Leslie Furgeuora-Espinoza, who was also a trained medical professional, pushed the emergency alarm to call for help." (*Id.* ¶ 50.) Officer Jones responded to the alarm and determined that Iriele "[would] be alright" and "could go to sick call." (*Id.* ¶ 51.) Officer Jones deactivated the alarm and did not alert anyone else about the emergency call. (*Id.*) Plaintiff claims that if Officer Jones had taken action, "[Iriele] could have been saved with blood thinners, anticoagulants, and thrombolytics." (*Id.* ¶ 52.)

After Jones left, Iriele told Furgeuora-Espinoza to go to breakfast; however, Furgeuora-Espinoza sought help. (*Id.* ¶ 53.) When Furgeuora-Espinoza returned, Iriele had collapsed on the floor and was writhing in pain. (*Id.* ¶¶ 53–54) Furgeuora-Espinoza pushed the emergency alarm again. (*Id.* ¶ 54.) When Officer Jones returned, he again deactivated the alarm, and he told Furgeuora-Espinoza to "fill out paperwork for Iriele and then take her to sick call." (*Id.*)

Furgeuora-Espinoza later hit the emergency alarm for a third time. (*Id.* ¶ 56.) Two different officers responded to this call and found Iriele unresponsive. (*Id.*)

They acknowledged the emergency and alerted medical personnel. (*Id.*) "When medical staff finally arrived to Iriele's cell, Potter started performing CPR." (*Id.* ¶ 57.) According to Plaintiff, "[h]ad Potter simply investigated the situation, as any reasonable health care provider would have done, he would have known that CPR was the exact wrong thing to do in such a situation." (*Id.*)

Two witnesses have stated that Iriele died in her cell. (*Id.* ¶ 58.) She died of a pulmonary infarction, which Plaintiff claims "is a known risk factor for persistent tachycardia[2]—for which Iriele consistently displayed signs." (*Id.* ¶¶ 64–67.) Furgeuora-Espinoza was sequestered and questioned in the wake of Iriele's death at the direction of Warden Bradley. (*Id.* ¶ 59.)

Prior to filing this lawsuit, Plaintiff submitted an administrative complaint to the Federal Bureau of Prisons' Southeast Regional Office. (*Id.* ¶ 8.) Plaintiff received a denial letter that was dated May 19, 2020. (*Id.*)

## II.   STANDARD OF REVIEW

In general, a pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, to withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint "must plead enough facts to state a claim to relief that is plausible on its face." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1347–48 (11th Cir. 2016) (quoting *Bell Atl. Corp. v.*

---

[2] Plaintiff claims that an elevated heart rate above 100 bpm constitutes tachycardia. (Doc. 5-1 ¶ 19 n.1.)

*Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Stated another way, the factual allegations in the complaint must be sufficient to "raise a right to relief above the speculative level." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010). A complaint that "succeeds in identifying facts that are suggestive enough to render [the necessary elements of a claim] plausible" will survive a motion to dismiss. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1296 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556) (internal quotation marks omitted).

In evaluating the sufficiency of a complaint, this Court first "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. This Court then "assume[s] the[] veracity" of the complaint's "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief." *Id*. Review of the complaint is "a context-specific task that requires [this Court] to draw on its judicial experience and common sense." *Id*. If the pleading "contain[s] enough information regarding the material elements of a cause of action to support recovery under some 'viable legal theory,'" it satisfies the notice pleading standard. *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011)

(quoting *Roe v. Aware Woman Ctr. for Choice, Inc*., 253 F.3d 678, 683–84 (11th Cir. 2001)).

## III.    ANALYSIS

### A.       Deliberate Indifference Claims

#### 1.    Count I: Deliberate Indifference to Medical Needs

The Individual Federal Defendants argue that Count I, Plaintiff's deliberate indifference as to medical needs count that is based on the Individual Federal Defendants' personal participation in Iriele's care, is due to be dismissed because Plaintiff has failed to state a claim and because they are entitled to qualified immunity. The Court addresses each argument, as it pertains to each Individual Federal Defendant, in turn.

#### a.  Whether Plaintiff Has Failed to State a Claim

When a prison official is deliberately indifferent to the serious medical needs of an inmate, the official violates the Eighth Amendment's prohibition of cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). To assert an Eighth Amendment deliberate indifference claim, a plaintiff must establish both that the plaintiff had an objectively serious medical need and that the official subjectively acted with deliberate indifference to that need. *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008). For purposes of this Motion to Dismiss, the Individual Federal Defendants do not dispute that Iriele suffered from an objectively

serious medical need. (Doc. 46 at 14.) Rather, the Individual Federal Defendants contest the subjective component. (*Id.*)

To show the official subjectively acted with deliberate indifference, "[t]he plaintiff must prove that the defendant (1) actually knew about a risk of serious harm; (2) disregarded that risk; and (3) acted with more than _____ negligence." *Wade v. McDade*, 67 F.4th 1363, 1370 (11th Cir. 2023) *(citing Hoffer v. Secretary, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020)) (space intentionally left blank by the Eleventh Circuit), *vacated sub. nom. Wade v. Ga. Corr. Health, LLC*, No. 21-14275, 2023 WL 6613842, at \*1 (11th Cir. Oct. 11, 2023), *reh'g granted*. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). But it is not sufficient to find that the defendants "should have known" about the risk of harm: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*." *Franklin v. Curry*, 738 F.3d 1246, 1250 (11th Cir. 2013) (quoting *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013)). In short, each defendant is judged individually based on what they know. *See Harper v. Lawrence County*, 592 F.3d 1227, 1234 (11th Cir. 2010).

There has been a divide among Eleventh Circuit panels as to whether the last prong of the subjective analysis requires an official to act with "more than mere negligence" or "more than gross negligence."[3] In *Wade v. McDade*, which the Eleventh Circuit is rehearing en banc, the Eleventh Circuit panel resolved the dispute in favor of the "more than gross negligence standard," explaining that the first panel to have confronted the issue adopted the "more than gross negligence standard." *Wade*, 67 F.4th at 1372 (citing *Townsend v. Jefferson*, 601 F.3d 1152, 1158 (11th Cir. 2010)). As the Eleventh Circuit has not heard the issue en banc, the *Wade* panel explained that it was bound by the prior-panel-precedent rule to proceed under the "more than gross negligence standard." *Wade*, 67 F.4th at 1373 (citing *United States v. Dailey*, 24 F.3d 1323, 1327 (11th Cir. 1994)). This standard is the "'equivalent of recklessly disregarding' a substantial risk of serious harm." *Wade*, F.4th at 1375 (quoting *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996)).

Whatever the Eleventh Circuit might decide when rehearing *Wade* en banc, until that ruling, this Court is also bound by *Townsend*. Accordingly, to establish a

---

[3] It is worth noting that at least one Eleventh Circuit panel has expressed that these "competing articulations" could "represent a distinction without a difference because . . . the Supreme Court itself has likened the deliberate-indifference standard to 'subjective *recklessness* as used in criminal law.'" *Patel v. Lanier County*, 969 F.3d 1173, 1188 n.10 (11th Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994)). "Accordingly, no matter how serious the negligence, conduct that can't fairly be categorized as *reckless* won't meet the Supreme Court's standard." *Patel*, 969 F.3d at 1888 n.10.

claim of deliberate indifference, Plaintiff must show that the Individual Federal Defendants acted with "more than gross negligence."

In terms of the specific type of conduct that constitutes "deliberate indifference to medical needs," the Eleventh Circuit has summarized:

> Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference. *Carswell v. Bay County,* 854 F.2d 454, 457 (11th Cir. 1988); *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700, 704 (11th Cir. 1985). Medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" constitutes deliberate indifference. *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir. 1986). "A doctor's decision to take an easier and less efficacious course of treatment" also constitutes deliberate indifferen[ce]. *Waldrop v. Evans,* 871 F.2d 1030, 1033 (11th Cir. 1989). Additionally, when the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference. *See Ancata,* 769 F.2d at 704. Also, delay in access to medical care that is "tantamount to 'unnecessary and wanton infliction of pain,'" may constitute deliberate indifference to a prisoner's serious medical needs. *Brown v. Hughes,* 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam) (quoting *Estelle,* 429 U.S. at 104, 97 S. Ct. at 291), *cert. denied,* 496 U.S. 928. Some delay in rendering medical treatment may be tolerable depending on the nature of the medical need and the reason for the delay. *Harris v. Coweta County,* 21 F.3d 388, 393–94 (11th Cir. 1994).

*Adams v. Poag*, 61 F.3d 1537, 1543–44 (11th Cir. 1995) (cleaned up). But mere medical malpractice or a failure to properly diagnose does not give risk to a deliberate indifference claim. *See McElligott v. Foley*, 182 F.3d 1248, 1254 (11th

Cir. 1999). Rather, deliberate indifference is typically only found in the most egregious situations. *See Wade*, 67 F.4th at 1376.

For example, a prison official is deliberately indifferent when they are aware of a serious medical need or are aware that a course of treatment is clearly inadequate, yet do nothing to improve the prisoner's condition. *See Patel*, 969 F.3d at 1190; *McElligott*, 182 F.3d at 1256; *Carswell v. Bay County*, 854 F.2d 454, 456 (11th Cir. 1988); *Goebert*, 510 F.3d at 1331. Based on Plaintiff's allegations, the actions of some, but not all, Individual Federal Defendants possibly fall into this category of deliberately indifferent conduct.

The Court's analysis starts with Dr. Griffin. Plaintiff alleges that Dr. Griffin knew of Iriele's increasingly serious medical needs and symptoms, but he took no action or acted clearly inadequately. (Doc. 51-1 ¶ 71.) Dr. Griffin allegedly knew of Iriele's condition because: "Indeed, in the days leading to her death, Iriele went to sick call every single day. She complained of the real and critical pain, and other symptoms she was experiencing . . . However, every day she sought help, she was turned away. Defendant Griffin cosigned each and every one of her sick call records." (*Id.* ¶ 79.) Further, when Iriele went to sick call between March 15–19, Dr. Griffin allegedly "belittled her, turned her away, and refused to diagnose her." (*Id.* ¶ 38.) Based on these allegations, it appears that Dr. Griffin knew of Iriele's risk of serious harm. He disregarded this risk by allegedly refusing to provide any treatment.

In fact, Plaintiff's Complaint alleges that the only treatment Iriele received, leading up to her becoming unresponsive on March 21, was Potter's recommendation to obtain hydrocortisone for her skin irritations. (*Id.* ¶ 36.) This was despite Iriele's reported symptoms of elevated heart rate, dramatic weight loss of nine pounds within four days, lightheadedness, weakness, and fever, among other symptoms. (*Id.* ¶¶ 34, 39, 42.) Blatantly ignoring all these combined symptoms was more than grossly negligent. *See Patel*, 969 F.3d at 1190; *McElligott*, 182 F.3d at 1256; *Carswell*, 854 F.2d at 456; *Goebert*, 510 F.3d at 1331. Plaintiff has stated a claim against Dr. Griffin.

For similar reasons, Plaintiff has asserted a claim against Potter. Plaintiff's allegations against Potter can be divided into two groups: allegations against Potter prior to Iriele becoming unresponsive on March 21, 2018 and allegations against Potter after that event. Regarding Potter's interaction with Iriele prior to March 21, Potter first evaluated her on March 15 (Doc. 51-1 ¶ 35), where it appears that Iriele presented with skin irritations, an elevated pulse rate, lightheadedness, weakness, and cold-like symptoms. (*Id.* ¶¶ 34–35.) According to the Complaint, when Iriele continued to go to sick call from March 15–19, Potter "belittled her, turned her away, and refused to diagnose her." (*Id.* ¶ 38.) "Potter was allegedly aware of repeated notations of tachycardia within Iriele's medical records" (*Id.* ¶ 108) and of her dramatic weight loss (*Id.* ¶ 106). But the only treatment Potter allegedly ever

provided during this timeframe was a recommendation for hydrocortisone to treat her rashes. (*Id.* ¶ 36.) These allegations, when combined, sufficiently establish that Potter was aware that Iriele faced a serious risk of harm and essentially ignored her, rather than trying to figure out the problem. Doing nothing in the face of an obviously serious medical problem is more than grossly negligent, and thus Plaintiff has stated a claim against Potter. *See Patel*, 969 F.3d at 1190; *McElligott*, 182 F.3d at 1256; *Carswell*, 854 F.2d at 456; *Goebert*, 510 F.3d at 1331.

The Court notes that the allegations regarding Potter's conduct after Iriele became unresponsive would not give rise to a deliberate indifference claim. Plaintiff seemingly blames Potter for performing CPR on Iriele after he was alerted of her unresponsive condition. (Doc. 51-1 ¶ 106.) Regardless of if, as Plaintiff claims, CPR was the worst possible treatment that Potter could have performed at the time (*Id.*), responding to an emergent situation by performing CPR is not more than grossly negligent. Accordingly, Potter was not deliberately indifferent when he performed CPR on Iriele; rather, Plaintiff has stated a claim against Potter for all that transpired prior to this event.

Plaintiff has also stated a claim against Nurse Knopp. According to Plaintiff, Nurse Knopp's involvement in Iriele's care was exclusive to a March 19, 2018 sick call visit. (*Id.* ¶ 39.) In this sick call visit, Iriele presented symptoms of fever, cough, congestion, elevated heart rate, and rapid weight loss. (*Id.* ¶¶ 39, 42.) Nurse Knopp

was allegedly aware of Iriele's history of elevated heart rate based on the repeated notations within her medical records. (*Id.* ¶ 91.) Nurse Knopp allegedly did not provide any treatment despite her knowledge of these symptoms. (*Id.* ¶ 88.) Even a lay person would recognize that losing nine pounds in four days, especially when combined with these other symptoms, signaled a serious medical problem. Accordingly, from these assertions, it appears that Nurse Knopp knew that Iriele was at serious risk of harm. And when Nurse Knopp allegedly did not provide any treatment or otherwise investigate the cause of Iriele's condition, Nurse Knopp disregarded this risk. Based on these alleged facts, a reasonable jury could determine that Nurse Knopp's disregard was more than grossly negligent. *See Patel*, 969 F.3d at 1190; *McElligott*, 182 F.3d at 1256; *Carswell*, 854 F.2d at 456; *Goebert*, 510 F.3d at 1331. Plaintiff has therefore stated a plausible claim against Nurse Knopp.

Whether Plaintiff has asserted a claim against Nurse Etheridge is a closer question. The allegations regarding Nurse Etheridge essentially are that he forcefully administered the TST and that he did not treat Iriele's persistent tachycardia. (Doc. 51-1 ¶¶ 28–29). Plaintiff also makes the conclusory allegation that Nurse Etheridge knew of Iriele's weight loss (*Id.* ¶¶ 122–23); however, there is no allegation that Nurse Etheridge treated Iriele after her initial health screen on March 8, 2018. As her weight loss occurred over the four-day period from March 15–19 (*Id.* ¶ 42), Nurse Etheridge could not have known about Iriele's rapid weight loss based on the

16

allegations in the Complaint. And thus, it follows that Nurse Etheridge was not deliberately indifferent by not responding to Iriele's weight loss.

It also follows that Nurse Etheridge did not actually know Iriele was at risk of serious harm, nor was he more than grossly negligent, by administering the TST. While Iriele told Nurse Etheridge she did not want another TST, Iriele's request was based on her belief that she had previously had a negative reaction to TSTs. (*Id.* ¶ 29.) Iriele allegedly told Nurse Etheridge that "her doctor specifically warned her to not let anyone give her that test again due to hypersensitivity concerns." (Doc. 14 ¶ 25.) However, as the Individual Federal Defendants describe in their Motion to Dismiss, a TST is a standard test for inmates entering a new prison. (Doc. 46 at 2, 15.) It is not apparent from the Complaint that the instruction from Iriele's doctor ever appeared in her medical records. Consequently, it is not clear that Nurse Etheridge would have known that performing such a standard test could cause a serious health condition. But even if Nurse Etheridge was aware, he did not act with more than gross negligence. "[I]t is axiomatic that simple medical malpractice does not give rise to the level of a constitutional violation." *Estelle*, 429 U.S. at 106. And at worst, Nurse Etheridge's conduct could be construed as simple malpractice. Therefore, Nurse Etheridge was not deliberately indifferent merely by administering the TST.

In terms of Nurse Etheridge not addressing Iriele's elevated heart rate, the Court still does not find deliberate indifference. Iriele had been experiencing an elevated heart rate for over six months prior to his examination. (Doc. 51-1 ¶¶ 19, 25, 27.) Her history of an elevated heart rate was catalogued in her health records, which Nurse Etheridge allegedly had access to. (*Id.* ¶¶ 28, 125.) However, unlike Dr. Griffin, Potter, and Nurse Knopp, Nurse Etheridge was not presented with any symptoms other than Iriele's elevated heart rate. Based on the extended time that Iriele had an elevated heart rate, and the fact that she complained of no other symptoms, Plaintiff has not established that Nurse Etheridge actually knew that Iriele was at serious risk of harm, that he disregarded that risk, or that he acted with more than gross negligence. Plaintiff's deliberate indifference claim against Nurse Etheridge fails.

Lastly, Plaintiff includes Warden Bradley in Count I. Plaintiff claims that Warden Bradley, "as supervisor of the prison and its employees, failed to ensure that inmates received adequate and prompt medical care by, including but not limited to the following: failing to create and implement sufficient policies and procedures regarding the provision of medical care to inmates, failing to ensure adequate and sufficient training regarding medical care for inmates, failing to provide proper supervision and discipline of jailers, and failing to ensure sufficient staffing to prevent deliberate indifference to the medical needs of inmates." (*Id.* ¶ 139.) There

is no allegation that Warden Bradley personally did anything that constitutes deliberate indifference; rather, Plaintiff's claims all involve Warden Bradley's actions in her supervisory capacity. Therefore, to the extent that Plaintiff asserts a deliberate indifference claim against Warden Bradley, it is properly considered under the supervisory liability counts, i.e. Counts II–IV.

### b. Whether Defendants Are Entitled to Qualified Immunity

Even if a prison official violated Iriele's Eighth Amendment rights, they may nonetheless be entitled to qualified immunity. Qualified immunity shields government officials from personal liability for civil damages. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To claim qualified immunity, a defendant official must first show that his allegedly wrongful act or omission occurred while he was engaged in a discretionary duty." *Goebert v. Lee County*, 510 F.3d 1312, 1329 (11th Cir. 2007). Once the official shows that they were engaged in a discretionary duty, the plaintiff must show that 1) the defendant violated a constitutional right and 2) that right was clearly established at the time of the violation. *See Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019).

The Individual Federal Defendants clearly acted within the scope of their discretionary authority. *See Hartley v. Butler*, 147 F. App'x 61, 61–62 (11th Cir. 2005) (holding that a defendant was entitled to qualified immunity because "the allegations in Plaintiff's complaint are sufficient to show that [Defendant] was acting

within his discretionary authority").[4] A government official acts within his discretionary authority if his actions "are of a type that fell within the employee's job responsibilities." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). Treatment and patient care decisions plainly fall within the job responsibilities of prison medical personnel. And prison policymaking, training, supervision and discipline, and staffing clearly falls within the job functions of a prison warden. Because the Individual Federal Defendants acted within their discretionary authority, the burden then shifted to Plaintiff to allege that Iriele's Eighth Amendment rights were violated and that these rights were clearly established.

As discussed above, Plaintiff did not sufficiently allege that Nurse Etheridge or Warden Bradley violated Iriele's Eighth Amendment rights[5] in Count I, and therefore they are entitled to qualified immunity on this Count. Plaintiff has sufficiently pled that Dr. Griffin, Potter, and Nurse Knopp violated Iriele's Eighth

---

[4] While opinions from the Federal Appendix are not binding on this Court, these opinions can be persuasive authority.

[5] Even if Plaintiff had alleged a constitutional violation against Nurse Etheridge, he would still be entitled to qualified immunity because Plaintiff has pointed the Court to no source of law where the administration of a standard test, like a TST, without a documented medical history of risk from such a test would constitute deliberate indifference. Nor has Plaintiff directed the Court to any source of law where failure to address a long-standing history of elevated heart rate, without any other symptoms, established deliberate indifference.

Amendment rights, and so the Court must determine whether Iriele's rights were clearly established.

A constitutional right is clearly established if it is one that "a reasonable person would have known." *Harlow*, 457 U.S. at 1818. There are "three sources of law that would put a government official on notice of statutory or constitutional rights: specific statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases already decided by state and federal courts in the relevant jurisdiction." *Goebert*, 510 F.3d at 1330. "Caselaw does not require a case directly on point for a right to be clearly established," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551).

The factual circumstances of this case are analogous to two cases cited by Plaintiff: *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999) and *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007). In *McElligott*, an inmate entered prison having experienced stomach pain for the previous five months, and during his six months in custody, his pain worsened. The prison's sole physician and nurse were notified of the prisoner's severe pain, but they only treated his pain by

prescribing Tylenol, Pepto-Bismol, and an anti-gas medication, Bentyl. The inmate's health continued to deteriorate, and he lost twenty pounds over his last two months in prison. Eventually, the inmate was hospitalized and diagnosed with terminal cancer. The court held that the prison physician and nurse were deliberately indifferent. *McElligott*, 182 F.3d at 1256. The court reasoned that a jury could find the physician and nurse were aware that the medications were not effective and that the inmate's health was deteriorating, yet they did nothing to alleviate his pain or further treat him. *Id.* at 1257–59. The court explained that the factual circumstances were very similar to *Carswell v. Bay County*, 854 F.2d 454 (11th Cir. 1988), where a pretrial detainee constantly pleaded for medical attention, was given ineffective treatment or ignored altogether by medical personnel, and was diagnosed as a diabetic eleven weeks, and fifty pounds lost, later. *McElligott*, 182 F.3d at 1331. The *McElligot* court did not fault the physician and the nurse for not diagnosing the cancer; rather, it was the lack of trying to diagnose or treat the inmate that amounted to deliberate indifference. *Id.* at 1256.

Similarly, in *Goebert*, the Eleventh Circuit found that a prison official was deliberately indifferent to an inmate's serious medical needs after the official disbelieved her medical complaints without any investigation. In *Goebert*, a pregnant inmate submitted a complaint to the jail captain, "inform[ing] him that she had been leaking fluid for nine days, that the jail doctor recognized the need for her

to see an outside doctor, that the problem had become worse since she was seen by the jail doctor, and that she had not felt the baby move for a few days before writing the complaint." *Goebert*, 510 F.3d at 1327. Two days later, the inmate was taken to the hospital, where she lost the baby. She did not receive a response from the captain until a week after her complaint, and his response was: "Medical can set up [an appointment with an obstetrician] at your expense if you desire." *Id.* at 1320. The court found the captain's conduct constituted deliberate indifference. *Id.* at 1325. As the court explained, the captain was obligated to investigate the matter. *Id.* at 1328. Instead, he simply chose to disbelieve her because she was an inmate. *Id.* at 1328–31. His decision not to investigate at all, in the face of an inmate experiencing a serious medical condition, was deliberately indifferent.

Based on the Eleventh Circuit's decisions in *McElligott* and *Goebert*, as well as *Carswell*, a reasonable person would have known that the alleged conduct of Dr. Griffin, Nurse Knopp, and Potter was deliberately indifferent. Like the defendants in *McElligott*, *Goebert*, and *Carswell*, Dr. Griffin, Nurse Knopp, and Potter were confronted with a situation where an inmate's health was obviously deteriorating. Iriele had lost a significant amount of weight in a short amount of time, and her condition continued to decline. And yet, Dr. Griffin, Nurse Knopp, and Potter allegedly did nothing. Because *McElligott*, *Goebert*, and *Carswell* put Dr. Griffin, Nurse Knopp, and Potter on notice that blatantly failing to investigate an inmate's

serious medical condition qualified as deliberate indifference, they are not entitled to qualified immunity.

### 2.   Counts II–IV: Supervisory Deliberate Indifference Claims

Plaintiff's remaining claims against the Individual Federal Defendants are deliberate indifference claims premised on supervisory liability. Specifically, Plaintiff asserts: Count II–Failure to Train and Supervise against Dr. Griffin and Warden Bradley; Count III–Failure to Discipline against Warden Bradley; and Count IV–Failure to Protect against Warden Bradley. Dr. Griffin and Warden Bradley have moved to dismiss these claims, arguing that Plaintiff has failed to state a claim and that they are entitled to qualified immunity. Specifically, Dr. Griffin and Warden Bradley argue that these claims "essentially rely on vicarious liability . . . or a general failure to protect inmates from staff's medical neglect," which cannot form the basis of a deliberate indifference claim. (Doc. 46 at 18.) The Court addresses whether Plaintiff has alleged a constitutional violation first, and whether Dr. Griffin and Warden Bradley are nonetheless entitled to qualified immunity on these claims second.

### a.  Whether Plaintiff Has Stated a Claim

"The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." *Braddy v. Fla. Dep't of Lab. & Emp. Sec.*, 133 F.3d 797, 802 (11th Cir. 1998). To establish supervisory liability

for a deliberate indifference claim, a plaintiff "cannot rely on theories of vicarious liability or respondent superior." *Williams v. Limestone County*, 198 F. App'x 893, 896 (11th Cir. 2006); *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Rather, "a plaintiff must allege that the supervisor personally participated in the alleged unconstitutional conduct or that there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Franklin*, 738 F.3d at 1249 (internal citations omitted); *see Gonzalez v. Reno*, 326F.3d 1228, 1234 (11th Cir. 2003). Specifically, when there is no allegation of personal participation, supervisory liability will be established when the supervisor adopts a facially unconstitutional policy or when the policy is unconstitutionally implemented. *Wade*, 67 F.4th at 1376 (citing *Goebert*, 510 F.3d at 1332).

Starting with Warden Bradley, it is clear that she did not "personally participate" in any unconstitutional conduct. Plaintiff does not allege that Warden Bradley ever had any direct contact with Iriele. *See Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994). Rather, Plaintiff's claims against Warden Bradley are premised on her alleged unconstitutional customs or policies that amounted to a failure to train or supervise, discipline, or protect. (Doc. 51-1 ¶¶ 158, 168, 173.)

Plaintiff does not sufficiently allege that Warden Bradley adopted facially unconstitutional policies. Plaintiff does assert that Warden Bradley "promulgated customs or policies of inadequate training or supervision that demonstrated

deliberate indifference." (*Id.* at ¶ 158.) And Plaintiff further asserts that Warden Bradley had a "custom or policy of failing to discipline her staff" and a "custom or policy of failing to protect the inmates in FCI Aliceville." (*Id.* at ¶¶ 168, 173.) But Plaintiff does not sufficiently allege what exactly these customs or policies were, or what made them facially unconstitutional. *See Franklin*, 738 F.3d at 1251. Plaintiff's allegations are plainly conclusory and are therefore insufficient to establish facially unconstitutional customs or policies.

Plaintiff's primary argument seems to be that Warden Bradley acted with deliberate indifference in implementing her customs and policies. In evaluating this challenge, the Court must determine "(1) whether the supervisor's failure to adequately train and supervise [, discipline, or protect] . . . constituted deliberate indifference to an inmate's medical needs; (2) whether a reasonable person in the supervisor's position would understand that the failure to train and supervise [, discipline, or protect] constituted deliberate indifference; and (3) whether the supervisor's conduct was causally related to the subordinate's constitutional violation." *Poag*, 61 F.3d at 1544. The causation element is satisfied when the Plaintiff shows "(1) 'a history [or pattern] of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so'; (2) 'a supervisor's custom or policy . . . results in deliberate indifference to constitutional rights'; or (3) 'facts support an inference that the supervisor directed

the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'" *Wade*, 67 F.4th at 1377 (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010) (alteration accepted) (internal citations and quotations omitted)). The history or pattern of deliberate indifference must be "obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences," so as to establish that the supervisor "had actual or constructive notice" of the violations. *Keith v. Dekalb County*, 749 F.3d 1034, 1048–49 (11th Cir. 2014) (first quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999); then quoting *Goebert*, 510 F.3d at 1332).

Plaintiff has not satisfied the causation element. Plaintiff argues that there was a pattern or history of abuse that was sufficient to put Warden Bradley on notice that inmates' medical needs were being treated with deliberate indifference by prison staff. (Doc. 52 at 17; Doc. 51-1 ¶¶ 157, 166, 171.) To show this alleged history or pattern, Plaintiff directs the Court to three district court cases that involved FCI Aliceville around the relevant time period: *Michel v. Fed. Bureau of Prisons FCI*, No. 7:16-cv-00863-RDP-HNJ, 2017 U.S. Dist. LEXIS 217499, at *1 (N.D. Ala. Nov. 15, 2017); *Smith v. United States*, No. 7:16-cv-00184-AKK-JHE, 2018 U.S. Dist. LEXIS 46388, at *1 (N.D. Ala. Mar. 5, 2018); and *Winston v. Aducci-*

*Washington*, No. 7:17-cv-01099-VEH-SGC, 2018 U.S. Dist. LEXIS 84021, at *1
(N.D. Ala. Apr. 19, 2018). (Doc. 52 at 17; Doc. 51-1 ¶¶ 157, 166, 171.)

But these cases do not establish a history or pattern of conduct that would put
Warden Bradley on "actual or constructive notice of a flagrant, persistent pattern of
violations." *Goebert*, 510 F.3d at 1332. In both *Michel* and *Winston*, the court
dismissed the claims brought against the individual defendants for failure to exhaust
administrative remedies, thereby not even reaching the merits of the plaintiffs'
claims, and dismissed the claims against Warden Bradley's predecessor because the
claims were essentially based on vicarious liability. *Michel*, 2017 U.S. Dist. LEXIS
217499, at *30–32; *Winston*, 2018 U.S. Dist. LEXIS 84021, at *13–14, 16–18. In
*Smith*, the court ultimately granted summary judgment to the United States on FTCA
claims: no deliberate indifference claims were even alleged. *Smith v. United States*,
No. 7:16-cv-00184-AKK-JHE, 2019 WL 1104996, at *52 (N.D. Ala. Jan. 22, 2019).
Thus, Plaintiff has fallen well-short of showing the widespread history or pattern of
abuse that would put Warden Bradley on notice that her policies were implemented
in a way amounting to deliberate indifference.

Further, Plaintiff has not established that Warden Bradley's customs or
policies generally resulted in deliberate indifference, or that she directed her
subordinates to act unlawfully or knew they would do so and failed to intervene. *See*
*Wade*, 67 F.4th at 1377. As a nonmedical professional, Warden Bradley was

"entitled to rely on medical judgments made by medical professionals responsible for prisoner care." *Williams*, 198 F. App'x at 897. She was generally entitled to trust prison medical professionals to appropriately monitor prisoner medical care. *See Wade*, 67 F.4th at 1378. There is also no allegation that Warden Bradley directed the medical staff to act with deliberate indifference, nor is there any sufficient allegation that she knew they would act with deliberate indifference. In short, nothing in the pleadings suggests that Warden Bradley had notice of the alleged deliberate indifference being shown to Iriele or to any other inmate. Warden Bradley was seemingly only named as a defendant in this lawsuit for one reason: because she was the warden. This is essentially a theory of vicarious liability, and it is insufficient to hold her liable.

Turning to Dr. Griffin, Plaintiff has sufficiently alleged that Dr. Griffin personally participated in unconstitutional conduct, or that there is at least a causal connection between his conduct and the alleged unconstitutional conduct of his subordinates. As a reminder, "[w]e apply a three-prong test to determine a supervisor's liability: (1) whether the supervisor's failure to adequately train and supervise subordinates constituted deliberate indifference to an inmate's medical needs: (2) whether a reasonable person in the supervisor's position would understand that the failure to train and supervise constituted deliberate indifference; and (3) whether the supervisor's conduct was causally related to the subordinate's

constitutional violation." *Poag*, 61 F.3d at 1544. Unlike Warden Bradley, Dr. Griffin consigned each of Iriele's sick call records, which documented her worsening condition, and he allegedly did nothing to correct the inaction of his subordinates. The failure to further train or supervise, on these facts, constitutes deliberate indifference and a reasonable supervising physician would understand this. Dr. Griffin's inaction caused, or at least had a causal connection to, his subordinates' alleged deliberate indifference because he knew they were acting unlawfully but did nothing to correct them. *See Fulwood v. Fed. Bureau of Prisons*, 568 F. App'x 753, 756 (11th Cir. 2014). Accordingly, Plaintiff has stated a deliberate indifference claim against Dr. Griffin for failing to train or supervise his subordinates.

### b. Whether Defendants Are Entitled to Qualified Immunity

As previously mentioned, to assert qualified immunity, a government official must first establish that they acted within their discretionary authority. *See Hartley*, 147 F. App'x at 61–62. After the official makes this showing, the burden shifts to the plaintiff to establish that the official violated a clearly established constitutional right. *See Corbitt*, 929 F.3d at 1311.

Warden Bradley easily satisfies this standard and is therefore entitled to qualified immunity. First, deciding how to train or supervise staff, when to discipline staff, and how to protect inmates falls clearly within the discretionary responsibilities of a prison warden. Second, Plaintiff has not alleged that Warden Bradley violated

Iriele's clearly established Eighth Amendment rights. To the contrary, it is clearly established that a prison warden, like Warden Bradley, is not deliberately indifferent merely because they are the warden. Consequently, Warden Bradley is entitled to qualified immunity.

Regarding Dr. Griffin, it is also clear that decisions about training or supervising subordinates falls within a supervising physician's discretionary authority. Further, as explained above, Plaintiff has stated a deliberate indifference claim against Dr. Griffin based on supervisory liability. However, the question remains whether Dr. Griffin's violated a clearly established constitutional right.

Plaintiff has not pointed the Court to a specific source of law that would put Dr. Griffin on notice that his alleged conduct as a supervisor was unconstitutional. In the Court's review of the case law, the closest parallel to Dr. Griffin's conduct is *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990). In *Greason*, an inmate with a history of mental illness committed suicide after a prison doctor, Dr. Fodor, discontinued his anti-depressant medication and failed to monitor him. Prior to stopping the medication, two mental health professionals had written reports advising against discontinuing the medication. These reports were maintained in the inmate's clinical file. The Eleventh Circuit denied summary judgment on the supervisory deliberate indifference claims against the prison clinical director, who was the direct supervisor of Dr. Fodor, and the director of mental health for the

Georgia Department of Corrections. *Id.* at 837–39. Regarding the prison clinical director, the Eleventh Circuit explained that he was aware the inmate's medication had been stopped due to his review of Dr. Fodor's notes, he was aware of the reports in the inmate's file advising against the discontinuation of the medication, and he was aware of a similar incident involving another inmate. *Id.* at 838. Because the prison clinical director failed to warn competent officials, despite his knowledge, the court held that a jury could find deliberate indifference. Regarding the director of mental health, the court explained that he had also received the reports advising against discontinuing the medicine and he was also aware of a similar incident involving a different inmate. *Id.* at 839. Because he failed to take any action despite this knowledge, the court determined that a reasonable jury could find deliberate indifference. *Id.*

While cases do not have to be identical to put a party on notice that their conduct was unconstitutional, denying qualified immunity here would be a bridge too far. Unlike in *Greason*, there was no letter in Iriele's file recommending a specific course of treatment that Dr. Griffin, as a supervising physician, ignored. Additionally, unlike in *Greason*, Dr. Griffin was not aware of a similar incident involving a different inmate. Thus, there were additional circumstances in *Greason* that are not present in this case. For that reason, the Court cannot say that Dr. Griffin was on notice that his conduct, as a supervisor, constituted deliberate indifference.

He was not sufficiently on notice that failure to train or supervise his subordinates, in these circumstances, was deliberately indifferent. Dr. Griffin is therefore entitled to qualified immunity as to this Count.

**B.     FTCA Claims**

The United States argues that Plaintiff's FTCA claims, Counts V–VI, are due to be dismissed because 1) the discretionary function exception bars Plaintiff's claims and 2) Plaintiff's FTCA claims are actually constitutional tort claims, repackaged as state tort claims. Thus, according to the United States, Plaintiff has failed to establish subject matter jurisdiction. Because Plaintiff's claims are barred by the discretionary function exception, the Court does not address the second argument.

The FTCA is a limited waiver of the federal government's sovereign immunity. *See Zelaya v. United States*, 781 F.3d 1315, 1321 (11th Cir. 2015). Under the FTCA, individuals may sue the government for state law torts that are committed by federal employees. *See id.* at 1323. However, one exception to the FTCA's waiver of the government's immunity is when an employee is performing a discretionary function. 28 U.S.C. § 2680(a).

For the discretionary function exception to apply, 1) "the conduct that forms the basis of the suit must involve an element of judgment or choice by the employee," *Zelaya*, 781 F.3d at 1329, and 2) the Court must "determine whether that

judgment is of the kind that the discretionary function exception was designed to shield." *Zelaya*, 781 F.3d at 1330 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). If an employee acts within their discretion, their conduct will be shielded, even if that discretion is abused. *Zelaya*, 781 F.3d at 1329. An employee will generally act within their discretion unless a "federal statute, regulation, or policy <u>specifically prescribes</u> a course of action for an employee to follow." *Shivers v. United States*, 1 F.4th 924, 931 (11th Cir. 2021) (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)), *cert. denied*, 2142 S. Ct. 1361 (2022); *see Cohen v. United States*, 151 F.3d 1338, 1344–45 (11th Cir. 1998) (explaining that if an employee violates internal guidelines set forth in the Bureau of Prison's Program Statement that mandate specific conduct, then the government will be liable under the FTCA and will not be protected by the discretionary function exception).

Plaintiff has argued that the discretionary function exception does not apply. Plaintiff originally relied on 18 U.S.C. § 4042(a)(2)–(3) as providing the nondiscretionary basis for which to allege FTCA violations. (Doc. 14 ¶ 108.) Plaintiff specifically alleged that, under  18 U.S.C. § 4042(a)(2)–(3), the United States had a nondiscretionary "duty to provide inmates with a safe and secure environment, free of dangers, including the dangers of deliberate indifference to serious medical needs" (*Id.* ¶ 109) and "to provide inmates a reasonably safe place with staff that are adequate in number and properly trained" (*Id.* ¶ 110). However,

the United States effectively rebutted Plaintiff's argument in its Motion to Dismiss by explaining how it is well-established that 18 U.S.C. § 4042(a)(2)–(3) allows the government ample discretion in protecting and caring for prisoners, including in making staffing decisions. (Doc. 44 at 12.); *see Shivers*, 1 F.4th at 929 ("[W]hile 18 U.S.C. § 4042 'imposes on the BOP a general duty of care to safeguard prisoners,' it 'leaves BOP personnel sufficient discretion about how their § 4042 duty of care is to be accomplished to warrant application of the discretionary function exception.'" (quoting *Cohen*, 151 F.3d at 1342)); *McFarland v. Warden*, 557 F. App'x 915, 916 (11th Cir. 2014). Plaintiff then altered its theory. (Doc. 51 at 5–7.)

Now, Plaintiff contends that the United States violated nondiscretionary duties defined in Federal Bureau of Prisons, Program Statement 6031.04. (Doc. 51 ¶ 179, 189; Doc. 53 at 7.) As Plaintiff highlights, Section 6031.04 states: "Treatment for [Medically Necessary – Acute or Emergent] conditions . . . is essential to sustain life or function and warrant **immediate attention**." (*Id.* (citing Federal Bureau of Prisons, Program Statement 6031.04, at 6 (2014)). Medically acute or emergent conditions are those "which without care would cause rapid deterioration of the inmate's health, significant irreversible loss of function, or may be life-threatening." Federal Bureau of Prisons, Program Statement 6031.04, at 5 (2014). Thus, according to Plaintiff, the United States had a nondiscretionary duty to provide immediate medical care to Iriele and then breached this duty. Further, Plaintiff contends that

Program Statement 6031.04 mandates certain staffing requirements that the United States failed to maintain. (Doc. 53 at 7 (citing PS 6031.04 (12)).

The United States argues that the Program Statement cannot define its duty under the FTCA. (Doc. 54 at 14.) To that end, the Court disagrees.

True, the federal government is not liable under the FTCA when an employee merely fails to perform duties mandated by a federal law or policy. *See Zelaya*, 781 F.3d at 1324; *see also Dalrymple v. United States*, 460 F.3d 1318, 1327 (11th Cir. 2006) ("Violating an internal policy or procedure does not create a cause of action under the FTCA against the government unless the challenged conduct is independently tortious under applicable state law."). For example, if an employee negligently violates an internal policy or procedure, but the employee owes no state law duty to the plaintiff, then the employee's conduct will not give rise to an actionable negligence claim under the FTCA. *See Smith v. United States*, 14 F.4th 1348, 1353 (11th Cir. 2020); *Smith v. United States*, 14 F.4th 1228, 1233–34 (11th Cir. 2021); *see also Dalrymple*, 460 F.3d at 1327–28.

But federal statutes, regulations, and guidelines may be relevant in "provid[ing] evidence that the government has assumed duties analogous to those recognized by local tort law" or "provid[ing] the standard of care against which the government's conduct should be assessed." *Zelaya*, 781 F.3d at 1324 (quoting *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1158 (D.C. Cir. 1985)).

Essentially, "the negligent performance of duties set out in federal statutes and regulations [and guidelines] may shore up a claim under the FTCA, 'but *only* if there are analogous duties under local tort law.'" *Zelaya*, 781 F.3d at 1324 (quoting *Art Metal-U.S.A.*, 753 F.2d at 1157; *see also Dalrymple*, 460 F.3d at 1327. For example, in *Cohen v. United States*, the Eleventh Circuit even discussed how violating mandatory duties set forth in the BOP's Program Statement would lead to FTCA liability under Georgia tort law. 151 F.3d at 1344–45. Here, Program Statement 6031.04 provides certain duties owed to inmates. And under Alabama law, prison officials owe inmates a duty of care. *See Sloss-Sheffield Steel & Iron Co. v. Weir*, 60 So. 851 (Ala. 1913); *Patton v. Thompson*, 958 So. 2d 303, 310 (Ala. 2006) ("Prison officials have a duty to exercise ordinary and reasonable care for the protection of persons in their custody."). The Court is satisfied Program Statement 6031.04 is analogous to Alabama tort law and can therefore define the United States's duty of care under the FTCA.

The next question becomes whether the United States's discharge of its duties, as defined by Program Statement 6031.04, involved discretion. At the outset, it is apparent that staffing decisions are discretionary under the policy. The policy specifically states that "[e]ach institution will assess the current health services staffing pattern" and that it is the physician's responsibility "[t]o provide training." Federal Bureau of Prisons, Program Statement 6031.04, at 14–15 (2014). The policy

does provide examples of staffing numbers that would be required based on specific inmate numbers,[6] but ultimately "[t]he provider-to-inmate ratio may also need to be adjusted depending on institution's security level, physical layout, and mission." *Id.* at 15. Together, this language allows prison officials ample discretion to create a staffing pattern and training program that is sufficient for each individual facility. These decisions are the kinds of decisions that the exception was designed to protect. *See McFarland*, 557 F. App'x at 916. Therefore, any FTCA claim that Plaintiff asserts based on staffing decisions and training is barred by the discretionary function exception.

As to whether the United States had a nondiscretionary duty to provide "immediate care" under Program Statement 6031.04, Plaintiff directs the Court to two cases where district courts in this Circuit determined that the guideline was nondiscretionary. (Doc. 53 at 8–11 (citing *Keahl v. United States*, No. 4:15-cv-15, 2017 WL 101781, at *1 (N.D. Fla. 2017); then citing *Krocka v. Georges*, No. 1:17-cv-5173, 2019 WL 13418253, at *1 (N.D. Ga. Jan. 30, 2019)). These cases are not binding on this Court, and they are not persuasive. Determining whether a medical condition is "acute or emergent," and what constitutes "immediate care," involves

---

[6] The Court notes that Plaintiff has not specifically pled how many staff were on duty during the relevant times at FCI Aliceville, nor how many should have been on duty. (Doc. 51-1 ¶ 181). Therefore, even if Program Statement 6031.04 provided a nondiscretionary duty, it is impossible for the Court to assess whether the United States was noncompliant.

the exact element of judgment or choice that the discretionary function exception was designed to protect. While at times these decisions may be straight-forward, that is not always the case. This is particularly apparent when comparing the circumstances present in *Keahl* and *Krocka* with the circumstances here. In both *Keahl* and *Krocka*, the plaintiffs had a specific diagnosis of an emergency condition, namely a macular hole and a detached retina, and a recommendation for immediate surgery. *See Keahl*, 2017 WL 101781, at *3, 6; *Krocka*, 2019 WL 13418253, at *1, 8–10. In contrast, Iriele had not been diagnosed with a medically emergent or acute condition, and no specific treatment had been recommended. Determining whether Iriele was suffering from an acute or emergent medical condition, and thus required immediate care, involved judgment, even if that judgment was abused. *See Zelaya*, 781 F.3d at 1329. Accordingly, the conduct at issue in this case falls within the discretionary function exception. Counts V and VI are due to be dismissed.

## IV.   CONCLUSION

For the reasons discussed above, the United States's Motion to Dismiss is GRANTED. (Doc. 44.) The Individual Federal Defendants' Motion to Dismiss is GRANTED in part and DENIED in part. (Doc. 46.) The only remaining count is Count I against Dr. Griffin, Potter, and Nurse Knopp. Nurse Etheridge, Warden Bradley, and the United States are hereby dismissed as defendants. Plaintiff's Motion for Leave to File a Second Amended Complaint is GRANTED as to the

remaining defendants. (Doc. 51.) The Court will enter an Order consistent with this

Memorandum of Opinion.


      **DONE** and **ORDERED** on December 5, 2023.

L. Scott Coogler
United States District Judge

215755