FILED

2024 Jan-05  PM 06:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| **GRANT SUNNY IRIELE, as** )<br>**Administrator of the Estate of** )<br>**ROSEMARY EWERE IRIELE (aka** )<br>**ROSEMARY OFUME)** )<br> )<br>**Plaintiff,** )<br> )<br>v. )<br> )<br> )<br>**OFFICER JONES,** )<br>**individually; RICHARD CARROLL** )<br>**GRIFFIN, individually; ELIZABETH A.** )<br>**KNOPP, individually; and CHRISTOPHER** )<br>**P. POTTER, individually.** )<br> )<br>**Defendants.** ) | **Civil Action No.**<br>**7:20-cv-00383-LSC**<br><br>**JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT

### NATURE OF THE CASE

1.      This is a civil action in which Plaintiff, by and through his attorneys, brings claims based on the Eighth Amendment to the United States Constitution, pursuant to the legal standards set forth in Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971) and its progeny.

2.      Plaintiff's decedent, Rosemary Iriele ("Iriele"), while an inmate in the custody of the Federal Bureau of Prisons ("BOP"), was treated with negligence and deliberate indifference as to her serious medical needs which proximately resulted in death.

3.      Plaintiff brings this suit to recover for the actions and inactions of the BOP, who failed in their duty to properly care for Iriele during her confinement at FCI Aliceville.

4.      As a federal inmate, Plaintiff was committed to the Government's care, custody, and control - her options for proper medical care were limited to what FCI Aliceville allowed. Inmates at FCI Aliceville rely on employees of the BOP, and especially the Warden, to ensure their serious medical needs are properly addressed so as not to result in the constitutional violation(s) of deliberate indifference to serious medical needs.

5.      As a result of the deliberate indifference to her serious medical condition, Iriele suffered an agonizing death on the floor of a jail cell while her cell-mate frantically tried to summon help to save Iriele's life.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this matter pursuant to U.S.C. §§ 1331 & 1346 (b)(1) as the claims in this case are brought against the Defendants under the Eighth Amendment to the United States Constitution, pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

7.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1402(b), as some or all the events upon which this action is based occurred in the Northern District of Alabama.

## PARTIES

8.      Plaintiff, Grant Iriele, is the son of the decedent, Rosemary Iriele. Plaintiff is over the age of nineteen (19) years and a citizen of the United States residing in New York, USA. Letters of Administration have been issued by the DeKalb County Probate Court which appointed Plaintiff as Administrator and legal representative of the Estate of Rosemary Iriele. As such, Plaintiff is directly authorized under Ala. Code § 6-5-410 to prosecute the decedent's claims in this lawsuit.

Further, Plaintiff, as Administrator of the Estate, has standing to bring claims for compensatory and other relief under 42 U.S.C. § 1983 and 42 U.S.C. §1988.

9.      Defendant Officer Jones, at all times relevant to this complaint, was employed by the BOP at FCI Aliceville, in which capacity he served as corrections officer.

10.      Defendant Richard Carroll Griffin, at all times relevant to this complaint, was employed by the BOP at FCI Aliceville, in which capacity he served as a medical officer.

11.      Defendant Elizabeth Knopp, at all times relevant to this complaint, was employed by the BOP at FCI Aliceville, in which capacity she served as nurse.

12.      Defendant Christopher Potter, at all times relevant to this complaint, was employed by the BOP at FCI Aliceville, in which capacity he served as a health aid and technician.

13.      All defendants above were, at all times relevant to this complaint, acting under color of United States law.

## FACTS

14.      On or near August 20, 2017, Plaintiff's decedent, Rosemary Iriele ("Iriele"), went through intake at FCI Aliceville.

15.      On or near August 24, 2017, during her initial health and intake screening at FCI Aliceville, Iriele had an elevated pulse rate of **110 bpm**.[1] No further investigation of the cause of her elevated pulse rate or prescription for treatment was noted.

---

[1] An abnormally elevated heart rate, or tachycardia, is defined as a resting heart rate above 100 bpm. *See Waites v. Limestone Corr. Facility*, 2017 U.S. Dist. LEXIS 98771, at *16, n.35 (N.D. Ala. Jun. 26, 2017) (citing Dorland's Illustrated Medical Dictionary 1795 and 1850, respectively (30th ed. 2003) ("tachycardia defines an excessive rapidity in the action of the heart; the term is usually applied to a heart rate above 100 beats per minute[.]") (internal quotations omitted).

3

16.     On this day, Iriele was also given a Tuberculin Skin Test ("TST"). However, Iriele had recently been given a TST on July 21, 2017, while she was at Robert A. Deyton Detention Facility (hereinafter "Lovejoy"), for which she tested positive.

17.     On information and belief, a Nurse Nikki (LNU), RN, at FCI Aliceville, evaluated Iriele's results of the TST and determined it to be negative. However, Nurse Nikki's evaluation and reading was done three (3) days after the cutoff time to properly evaluate results.

18.     The TST only tests whether an individual has ever been exposed to Tuberculosis ("TB"), it does not confirm whether someone actually has the infection. A confirming chest x-ray is required to further the tuberculosis diagnosis. Also, it is quite rare to receive a negative result after a positive result; especially after the positive test was determined only a month prior.

19.     As an important medical history fact, Iriele was born outside of the United States and had received the Bacillus Calmette–Guérin ("BCG") vaccine for TB as a child.  Because Iriele had just received a positive result the previous month, she appropriately should have been subjected to a particularized 2-step test to eliminate or greatly reduce the potential for an inaccurate reading. However, Nurse Nikki failed to conduct the 2-step test or any additional testing on Iriele.

20.     On August 31, 2017, about a week after the second administration of TST, Iriele initiated a sick call visit, complaining of pain in her extremities and what she believed to be physical adverse reactions to the TST. Her measured pulse rate was recorded as **102 bpm**. However, no treatment was recommended or offered.

21.     On September 13, 2017, Iriele attended her scheduled medical examination by Defendant Richard Griffin ("Griffin"), a medical doctor and medical officer for FCI Aliceville. During this examination Griffin recorded Iriele's pulse rate as **119 bpm**. However, Griffin did not

4

order any further testing to investigate the cause of Iriele's tachycardia; nor did Griffin recommend or record any treatment for Iriele's concerning her abnormally elevated pulse rate.

22.     Later that month, Iriele was transferred out of Aliceville and back to Lovejoy. When she arrived back at Lovejoy, Iriele was given a chest x-ray for TB with a negative result showing no evidence of tuberculosis.

23.     During the months of her stay at Lovejoy, Iriele still experienced concerning signs of tachycardia. Specifically, Iriele's recorded high pulse rates ranged from **105-110 bpm**[2] while at Lovejoy.

24.     On or near March 7, 2018, Iriele was sent back to Aliceville. Upon returning, Iriele underwent an additional intake health screening, conducted by Nurse Jason Scott Etheridge. Iriele's pulse rate at the time was recorded as **105 bpm**. The health screening involved a review of previous health records, including the elevated pulse rate readings from the previous months at Lovejoy. Iriele's examination was conducted by Etheridge. The examination was reviewed and cosigned by Defendant Griffin. Neither individual recommended or recorded treatment for Iriele's persistent tachycardia symptoms.

25.     Instead, Etheridge insisted on administering yet another TST. When Iriele protested against and tried to explain her relevant medical history and, what she believed to be, her adverse reactions to previous TST's, Etheridge ignored Iriele's pleas and threatened to throw her in solitary confinement ("SHU") as punishment if she did not allow yet another TST procedure. The test was administered. However, Etheridge then failed to document the administration of the

---

[2] **During the roughly four month period that she was returned to Lovejoy, Iriele had only one recorded normal pulse rate reading of 90 bpm, on 10/7/17.**

test or removed it from Iriele's medical file, upon realizing it may have harmed Iriele. There appears to be no record of this test in her file: no record of the lot number, dosage, or antigen used in her medical file.

26.     Indeed, Iriele explicitly protested the redundant, unnecessary, and potentially harmful TST administered by Etheridge. In conducting this test, Etheridge disregarded regard BOP policy as it relates to TB testing history or her medical records. Instead of following appropriate protocol, Etheridge forced Iriele to get the TST injection, using the threat of SHU confinement.

27.     Immediately after the March 8, 2018 testing by Etheridge, Iriele documented the incident and submitted a grievance/complaint to the staff at FCI Aliceville detailing that she had been forced to take the TST or face solitary confinement.

28.     Soon after filing the complaint, Nurse Etheridge came to Iriele's cell, apologized and attempted to be friendly with her. Etheridge's actions demonstrated the fact that FCI Aliceville, including its medical staff, were aware of Iriele's grievance/complaint. Further, Iriele recounted this event to her children by phone.

29.     After the TST administration on March 8, 2018, Iriele became gravely ill, which was uncharacteristic of her. This was so strange that Iriele's son, was taken aback by it when he learned of her condition when the two spoke by telephone. Leading up to March 8, 2018, Iriele had been tested twice, but she had never reacted to any other TST administration prior to the one administered by Nurse Etheridge. Both Iriele and her son believed that her worsening physical condition was attributed to the forced TST.

30.     On a phone call with her daughter, Iriele detailed her deteriorating physical condition and what she thought was an adverse reaction to the tuberculosis test. She described her

6

symptoms and that her body felt horrible all over. She described that she felt itchy, dizzy, lightheaded, couldn't walk long distances, and began showing cold like symptoms.

31.     On March 15, 2018, Iriele visited the clinic as a result of requesting a sick call and complained that she might have been having some form of adverse reaction to the TST forced upon her by Etheridge. FCI Aliceville's "Health Aide and Technician" Christopher P. Potter ("Potter")[3], evaluated Iriele based on her complained of symptoms determined that she was exaggerating her symptoms and there is nothing wrong with her.  Quite contrarily though, Iriele displayed skin irritations on her face and back and had a recorded pulse rate of **104 bpm**. Yet again, Potter did not offer or give Iriele any treatment. Most remarkably, the examination findings and her reports of skin irritations and her elevated pulse rate were reviewed by Defendant Griffin. Griffin's review and his inaction to address Iriele's worsening symptoms are documented within her medical records.

32.     Unsurprisingly, Potter's determination that Iriele was not experiencing any medically significant symptoms is contradicted by other inmates and Iriele's calls with her children. Indeed, during the phone calls between March 15-19, 2018, Iriele described rashes and even stated that she was told by Potter to get Hydrocortisone from the commissary, which she did.

33.     As her condition dramatically worsened between March 15 and March 19, Iriele kept going to "sick call" and asking to receive medical attention. Her symptoms were getting worse and the medical staff, including defendant Griffin, failed to respond by investigating the cause of her symptoms.

---

[3] Notably, Potter is not a registered nurse in Alabama.

34.     Richard Griffin ("Griffin"), medical doctor and medical officer for FCI Aliceville, and Potter, were well aware of Iriele's suffering and serious medical need. When Iriele was at the FCI Aliceville infirmary, Griffin and Potter belittled her, turned her away, and refused to diagnose her or otherwise provide her with medical care.  Witnesses recounted that not only were her pleas for medical treatment denied, but Griffin and Potter also accused her of faking illness in an effort to get free medicine. Indeed, according to Iriele's medical records there was no medical evaluation to ascertain her condition between March 15 and March 19, but the medical staff callously and continually rejected her pleas to receive medical care.

35.     On March 19, 2017, two days before her death, Iriele again iniated a sick call visit, complaining of fever, persistent cough, and nasal congestion. She was seen by Nurse Knopp. Knopp recorded Iriele's pulse rate as 113 bpm. Knopp offered Iriele no treatment for her overt tachycardia or other symptoms. Griffin reviewed Knopp's findings, notes, and lack of treatment for the tachycardia and other symptoms and cosigned the record.

36.     However, the medical staff, including Defendants Griffin, Knopp and Potter were determined to not take Iriele's medical complaints seriously and to disregard her very serious deteriorating physical condition.  Had either one of them actually examined Iriele, they would have easily spotted her obvious pulmonary emboli ("PE") symptoms that required immediate medical attention. A simple evaluation would have prevented Iriele's untimely demise. The symptoms Iriele was experiencing included the following:

- Acute Cough
- Chest Pain
- ***Tachycardia (Elevated resting heart rate above 100 beats per minute)***
- Cyanosis (Blue/Gray appearance)
- Dyspnea (Difficulty breathing)

8

- Migraine with Aura (Headache with vision issues)
- Skin rash
- Lightheadedness/Dizziness
- Unexplained drop in weight
- Unexplained drop in blood pressure
- Sudden blurry vision
- No elevated temperature
- EKG that shows signs of previous heart issues

37.     Even discounting the symptoms reported by other Inmates and what Iriele was able to convey to her children over the phone, symptoms were still present that the Merck manual warned as red flags. The following are of particular importance:

- ***Unexplained drop in weight loss***
- ***Persistent tachycardia***
- Unexplained drop in blood pressure
- Sudden blurry vision
- No elevated temperature
- EKG that shows previous heart issues

According to the Merck manual, all of the above symptoms warranted immediate medical attention. However, based on witness testimony, letters, and Iriele's medical files, Nurse Knopp took no action on March 19, 2017 or took clearly inadequate, cursory action, so as to amount to no treatment, preventing Iriele from receiving necessary and appropriate medical care. It is apparent that Nurse Knopp was merely recording symptoms that would allow her to disregard the symptoms and deny the serious medical care Iriele obviously needed.

38.     In fact, had Iriele lost 9 lbs in 4 days. It is bewildering that Knopp did not notate such dramatic weight loss as a problem and perform further tests and evaluation. Even a lay person would know something is wrong if someone complaining of sickness loses that much weight in

9

such a short period of time. However, Knopp failed to take additional action and Iriele was not given further treatment or testing.

39.     Nurse Knopp made absolutely no attempt to provide Iriele with any such medical care despite being well aware of the risks. Knopp either knew, or should have known, of Iriele's serious medical need. Knopp deliberately chose to ignore Iriele's patently obvious symptoms, intentionally declined to even provide Iriele medication to suppress the symptoms and left her to needlessly suffer. Sadly, Iriele was forced to turn to other inmates to get help in trying to ease the pain from the symptoms she was experiencing.

40.     Iriele became increasingly desperate and started reaching out to her children about how Aliceville was refusing to treat her or even supply her with medication to suppress the symptoms. Iriele also made her children aware that Aliceville staff told her she was "faking" her condition.

41.     When Iriele reported what she was experiencing to her children, they immediately made complaints with Aliceville via phone and also to Iriele's criminal appellate attorneys.

42.     On a phone call with her daughter on March 18, 2018, Iriele further detailed how she had been coughing throughout the night. Iriele was gravely concerned because as a healthcare provider herself she had been exposed to all sorts of pathogens in the past but had never experienced any issue.

43.     In the days leading to her death, according to a witness, Lorri Jackson-Brown [69947-019], Iriele was coming out of the medical unit. Iriele was crying in pain—you could look at her and tell she was in pain. Iriele said to Jackson-Brown "they won't do anything to help me".

10

44.     According to Kerstin Preis-Jones [76405-379], Iriele told her that her chest hurt, and her head hurt on Tuesday. Iriele died the next day on a Wednesday. On the Tuesday they talked, Iriele told Preis-Jones that medical "doesn't want to do anything to help me."

45.     Knopp recorded Iriele's pulse rate as 113 bpm on March 19, 2017.  Griffin reviewed Knopp's clinical documentation and signed off.

46.     On the morning of March 21, 2018, Iriele's condition became so severe that she could not lie down due to severe difficulty breathing and she feared completely losing her breath altogether and dying as a result. Iriele's roommate, Leslie Furgeuora-Espinoza, who was also a trained medical professional, pushed the emergency alarm to call for help.

47.     A correctional officer, Officer (FNU) Jones, responded to the call. Jones deactivated the alarm, observed Iriele's obvious and serious medical condition - she was literally dying in front of him -and then made his own "medical" determination about Iriele by stating "she will be alright" and that "she can go to sick call". Jones did not call medical staff or alert anyone that there was a medical emergency taking place.

48.     As dire as this situation was, at the time Officer Jones observed Iriele, there was a high probability that she could have still been saved with blood thinners, anticoagulants, and thrombolytics. Jones had a duty to Iriele as it related to her safety; he observed her and disregarded the serious medical need and unilaterally concluded that there was no emergency. As a result, Jones did nothing to raise the alarm of Iriele's obvious and rapidly deteriorating condition.

49.     After Jones dismissed the emergent condition, Iriele had all but given up hope. She was able to tell her roommate Leslie to just go to breakfast and leave her there because there was nothing more she could do for her. Leslie instead sought medication and anyone else that may be

11

able to help. However, by the time she returned to Iriele the situation had gotten much worse and Iriele was collapsed on the floor.

50.     Leslie hit the emergency alarm again. The same officer came and angrily told Leslie, in a most flippant manner, to fill out paperwork for Iriele and then take her to sick call. Officer Jones failed to raise any emergency alert/alarm to notify medical staff that an emergency was taking place, nor did he do anything to help get Iriele to the medical unit. Rather, he simply turned off the emergency alarm for the second time and left Iriele as she lay writhing in pain.

51.     Again, Iriele's serious medical need was directly observed, but she was left to die by correctional officers inside Aliceville. Had it not been for the repeated, callous derelictions of duty, and deliberate indifference to Iriele's serious medical needs, she would be alive today.

52.     Iriele's condition continued to deteriorate, and Leslie hit the emergency alarm for a 3rd time. This time two different officers came and asked what was wrong. These officers acknowledged it was an emergency situation and tried to help Iriele. However, Iriele was largely unresponsive.

53.     When medical staff finally arrived to Iriele's cell, Potter started performing CPR. Had Potter simply investigated the situation, as any reasonable health care provider would have done, he would have known that CPR was the exact wrong thing to do in such a situation. Potter failed to properly diagnose the situation and perform the correct procedure.

54.     Iriele died in her cell according to two (2) separate witnesses. Notably missing from Aliceville's medical records are vitals, blood pressure, BPM or any instrumental measurements taken when FCI Aliceville personnel claimed to be performing procedures to save her life.

55.     Following Irielle's death, and at the direction of Warden Patricia V. Bradley, unnamed investigators sequestered Leslie Furgeuora-Espinoza, Iriele's cellmate and the inmate with the most first-hand knowledge of Iriele's pain, suffering, emotional distress, and wrongful death. Leslie was sequestered and locked in a bathroom for several hours, where the investigators repeatedly attempted to coerce Leslie to say that Iriele had fallen or otherwise injured herself and that was how she died. It was only after Leslie's repeated refusal to be coerced, that the investigators actually inquired about the circumstances around Iriele's death.

56.     Multiple witnesses stated that security camera footage should be reviewed to corroborate everything that happened to Iriele. A spoliation letter was sent to FCI Aliceville, shortly after Iriele's death regarding the preservation of evidence.

57.     Iriele's family believed the BOP, and whoever they used to conduct the autopsy, was going to try to protect themselves from the consequences of any wrongdoing. As such, Iriele's family opted to have an independent autopsy performed.

58.     When the family asked for Iriele's body to be sent to them so that an independent autopsy could be performed, they were informed that Iriele would not be released to them for two (2) months. The family was told that such a time frame was standard BOP policy.

59.     Sadly, in what can only be described as an attempt to obfuscate the circumstances around her death, Defendants have obviously altered, removed or did not document what witnesses and defendants observed in the days leading up to and on the day of Iriele's death; removed records of phone calls between March 15th and March 20th of 2018; delayed turning over Iriele's body and the results of their autopsy; left out the underlying cause of the pulmonary infarction; and prevented her family from performing a quick/timely independent autopsy after death.

60.     The state's autopsy report made no mention of Iriele's underlying cause of death. It mentions a pulmonary infarction, but the underlying cause was left blank.

61.     After having an independent autopsy performed, Iriele's family were able to confirm that the underlying cause of death was a collection of small pulmonary emboli. According to the CDC this is both a preventable and easily treatable condition, if addressed timely.

62.     FCI Aliceville's staff are directly responsible for Iriele's death. To be clear: Iriele did everything she could do for herself given the circumstances. This is not a case where a set of individuals simply "overlooked" something, and the victim kept silent. Rather, Iriele repeatedly voiced her complaints and exhibited symptoms so obvious that a lay person would understand she was experiencing an emergency medical condition. Iriele also verbalized many of her afflictions and concerns in recorded phone calls to her children.

63.     Moreover, a pulmonary infarction is a known risk factor for persistent tachycardia– for which Iriele consistently displayed signs.

64.     On the day of her death, when the situation was dire, the correctional officers were called via the emergency alarm but neglected their duty to immediately get medical attention for an inmate in an emergency medical situation and, also, were deliberately indifferent to Iriele's serious medical needs. Not once, but twice.

65.     Each Defendant had the duty and the opportunity to protect or help Iriele, to obtain necessary medical treatment for her in a timely manner, and to refrain from belittling Iriele and dismissing her pain, suffering, and emotional distress. Each Defendant was aware of repeated notations of tachycardia within Iriele's medical records but failed to investigate with further diagnostic tools and failed to provide any treatment to lessen the risks of a life-threatening ischemic

14

event, including the pulmonary infarction which claimed Iriele's life. Each Defendant, instead, failed or refused to perform their duty owed to Iriele - thereby, proximately causing Iriele's extreme pain and suffering, emotional distress, and eventual death.

**COUNT I**
**Eighth Amendment: Deliberate Indifference as to Medical Needs**
**(Against All Individual Defendants)**

*Defendant Griffin*

66.     Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 14-65 above.

67.     Defendant Griffin, despite the knowledge he had of Iriele's serious medical needs and serious symptoms (such as persistent tachycardia and sudden weight loss), and the need for immediate serious further investigation and medical treatment, and the foreseeable consequences of not adequately treating these serious medical needs, took no action or took clearly inadequate, cursory action so as to amount to no treatment, prevented her from receiving necessary and appropriate treatment and care, and were so grossly incompetent and inadequate as to shock the conscience.

68.     Defendant Griffin knew of the risk of serious harm to Iriele when he was made aware that she exhibited signs of tachycardia and sudden weight loss, yet disregarded that risk by failing or refusing to provide care, delaying care, providing grossly inadequate care, an easier but less effective course of treatment, or cursory care that amounts to no treatment at all. *See Magwood v. Sec'y. Fla. Dep't of Corr.,* 652 F. App'x 841, 844 (11th Cir. 2016).

15

69.     Defendant Griffin was not investigating, by testing or otherwise, the causes of significant deteriorations of inmate health or symptoms that obviously indicate potentially life-threatening conditions. He was deliberately indifferent to Iriele's serious medical needs on numerous occasions. The only complete examination done on Iriele was after her death.

70.     Defendant Griffin was aware of repeated notations of tachycardia within Iriele's medical records but failed to investigate with further diagnostic tools and failed to provide any treatment to lessen the risks of a life-threatening thrombotic event, including the pulmonary embolism which claimed Iriele's life.

71.     Throughout this entire process the only thing Iriele required was blood thinners, anticoagulants, and thrombolytics to save her life. Defendant Griffin actually examined her as is his duty, Iriele would very likely still be alive today. However, Iriele died a preventable death on Defendant Griffin's watch.

72.     Deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment.

73.     Iriele had – as do all inmates in the custody of the BOP have - a clearly established right under the Eighth Amendment to the United States Constitution not to be subjected to cruel and unusual punishment while incarcerated.

74.     Deliberate Indifference to a serious medical need is not a legitimate form of punishment, it is not an ancillary component of any prison sentence, and it serves no legitimate purpose.

16

75.     Defendant Griffin violated Iriele's rights by repeatedly and deliberately failing to get her proper medical treatment or delaying her proper medical treatment. Indeed, in the days leading to her death, Iriele went to sick call every single day. She complained of the real and critical pain, and other symptoms she was experiencing. Each time she attended a sick However, every day she sought help, she was turned away. Defendant Griffin cosigned each and every one of her sick call records.

76.     Defendant Griffin failed in his duty to provide Iriele with constitutionally safe and secure conditions of confinement by subjecting her to deliberate indifference of her serious medical needs.

77.     Defendant Griffin had subjective knowledge of the substantial risk of serious harm to Iriele if she did not receive medical treatment. However, he responded with deliberate indifference to that risk and denied or delayed Iriele medical treatment that could have saved her life.

78.     Defendant Griffin's conduct, or lack of response, constituted more than gross negligence, but was reckless and deliberately indifferent to Iriele's serious medical needs.

79.     Defendant Griffin's wrongful conduct resulted from a custom or policy of refusing or delaying medical treatment to inmates at FCI Aliceville.

80.     Defendant Griffin is not entitled to any form of immunity because he was not performing a legitimate job-related function through means that were within their power to utilize.

Defendant Griffin did not have discretion to deny an inmate necessary medical care that would have saved her life.

81.     At the time of this incident, it was clearly established that deliberate indifference to serious medical needs of an inmate is a violation of the Eighth Amendment. As such, Defendant Griffin is not entitled to immunity.

82.     As a direct and proximate result of Defendant Griffin's deliberate indifference, Iriele was subjected to unnecessary and wanton pain, and emotional and physical injury that resulted in death.

*Defendant Elizabeth Knopp*

83.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 14-65 above.

84.     Defendant Knopp, despite the knowledge she had of Iriele's serious medical needs and symptoms (such as persistent tachycardia and sudden weight loss), and the need for immediate serious medical treatment, and the foreseeable consequences of not adequately treating these serious medical needs, took no action or took clearly inadequate, cursory action so as to amount to no treatment, prevented her from receiving necessary and appropriate treatment and care, and was so grossly incompetent and inadequate as to shock the conscience.

85.     Defendant Knopp knew of the risk of serious harm to Iriele when she was made aware that she exhibited signs of tachycardia and sudden weight loss, yet disregarded that risk by failing or refusing to provide care, delaying care, providing grossly inadequate care, an easier but

less effective course of treatment, or cursory care that amounts to no treatment at all. *See Magwood v. Sec'y. Fla. Dep't of Corr.,* 652 F. App'x 841, 844 (11th Cir. 2016).

86.    Defendant Knopp was not investigating, by testing or otherwise, the causes of significant deteriorations of inmate health or symptoms that obviously indicate potentially life-threatening conditions. She was deliberately indifferent to Iriele's serious medical needs on numerous occasions. The only complete examination done on Iriele was after her death.

87.    Defendant Knopp was aware of repeated notations of tachycardia within Iriele's medical records but failed to investigate with further diagnostic tools and failed to provide any treatment to lessen the risks of a life-threatening thrombotic event, including the pulmonary embolism which claimed Iriele's life.

88.    Throughout this entire process the only thing Iriele required was blood thinners, anticoagulants, and thrombolytics to save her life. Had Defendant Knopp actually examined her as is her duty, Iriele would very likely still be alive today. However, Iriele died a preventable death on Defendant Knopp's watch.

89.    Deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment.

90.    Iriele had – as do all inmates in the custody of the BOP have - a clearly established right under the Eighth Amendment to the United States Constitution not to be subjected to cruel and unusual punishment while incarcerated.

19

91.    Deliberate Indifference to a serious medical need is not a legitimate form of punishment, it is not an ancillary component of any prison sentence, and it serves no legitimate purpose.

92.    Defendant Knopp violated Iriele's rights by repeatedly and deliberately failing to get her proper medical treatment or delaying her proper medical treatment. Indeed, in the days leading to her death, Iriele went to sick call every single day. She complained of the real and critical pain, and other symptoms she was experiencing. Each time she attended a sick However, every day she sought help, she was turned away.

93.    Defendant Knopp failed in her duty to provide Iriele with constitutionally safe and secure conditions of confinement by subjecting her to deliberate indifference of her serious medical needs.

94.    Defendant Knopp had subjective knowledge of the substantial risk of serious harm to Iriele if she did not receive medical treatment. However, she responded with deliberate indifference to that risk and denied or delayed Iriele medical treatment that could have saved her life.

95.    Defendant Knopp's conduct, or lack of response, constituted more than gross negligence, but was reckless and deliberately indifferent to Iriele's serious medical needs.

96.    Defendant Knopp's wrongful conduct resulted from a custom or policy of refusing or delaying medical treatment to inmates at FCI Aliceville.

97.     Defendant Knopp is not entitled to any form of immunity because she was not performing a legitimate job-related function through means that were within their power to utilize. Defendant Knopp did not have discretion to deny an inmate necessary medical care that would have saved her life.

98.     At the time of this incident, it was clearly established that deliberate indifference to serious medical needs of an inmate is a violation of the Eighth Amendment. As such, Defendant Knopp is not entitled to immunity.

99.     As a direct and proximate result of Defendant Knopp's deliberate indifference, Iriele was subjected to unnecessary and wanton pain, and emotional and physical injury that resulted in death.

*Defendant Christopher Potter*

100.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 14-65 above.

101.     Defendant Potter, despite the knowledge he had of Iriele's serious medical needs and serious symptoms (such as tachycardia and sudden weight loss), and the need for immediate serious medical treatment, and the foreseeable consequences of not adequately treating these serious medical needs, took no action or took clearly inadequate, cursory action so as to amount to no treatment, prevented her from receiving necessary and appropriate treatment and care, and was so grossly incompetent and inadequate as to shock the conscience.

102.    Defendant Potter knew of the risk of serious harm to Iriele when he was made aware that she exhibited signs of tachycardia and sudden weight loss, yet disregarded that risk by failing or refusing to provide care, delaying care, providing grossly inadequate care, an easier but less effective course of treatment, or cursory care that amounts to no treatment at all. *See Magwood v. Sec'y. Fla. Dep't of Corr.,* 652 F. App'x 841, 844 (11th Cir. 2016). What's more, Defendant Potter failed to administer the appropriate life-saving measures for Iriele—while Iriele was unconscious from her pulmonary embolism, Defendant Potter conducted CPR. CPR is the worst treatment for a pulmonary embolism. Had Defendant Potter adequately assessed the situation (and addressed Iriele's symptoms in the days prior), he would have known that CPR would place Iriele at further risk of death.

103.    Defendant Potter was not investigating, by testing or otherwise, the causes of significant deteriorations of inmate health or symptoms that obviously indicate potentially life-threatening conditions. He was deliberately indifferent to Iriele's serious medical needs on numerous occasions. The only complete examination done on Iriele was after her death.

104.    Defendant Potter was aware of repeated notations of tachycardia within Iriele's medical records but failed to investigate with further diagnostic tools and failed to provide any treatment to lessen the risks of a life-threatening thrombotic event, including the pulmonary embolism which claimed Iriele's life. Rather, Defendant Potter provided "treatment" that increased the risks of the pulmonary embolism.

105.    Throughout this entire process the only thing Iriele required was blood thinners, anticoagulants, and thrombolytics to save her life. Had Defendant Potter actually examined her as

22

is his duty, Iriele would very likely still be alive today. However, Iriele died a preventable death on Defendant Potter's watch.

106.    Deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment.

107.    Iriele had – as do all inmates in the custody of the BOP have - a clearly established right under the Eighth Amendment to the United States Constitution not to be subjected to cruel and unusual punishment while incarcerated.

108.    Deliberate Indifference to a serious medical need is not a legitimate form of punishment, it is not an ancillary component of any prison sentence, and it serves no legitimate purpose.

109.    Defendant Potter violated Iriele's rights by repeatedly and deliberately failing to get her proper medical treatment or delaying her proper medical treatment. Indeed, in the days leading to her death, Iriele went to sick call every single day. She complained of the real and critical pain, and other symptoms she was experiencing. Each time she attended a sick However, every day she sought help, she was turned away.

110.    Defendant Potter failed in his duty to provide Iriele with constitutionally safe and secure conditions of confinement by subjecting her to deliberate indifference of her serious medical needs.

111.    Defendant Potter had subjective knowledge of the substantial risk of serious harm to Iriele if she did not receive medical treatment. However, he responded with deliberate

23

indifference to that risk and denied or delayed Iriele medical treatment that could have saved her life.

112.    Defendant Potter's conduct, or lack of response, constituted more than gross negligence, but was reckless and deliberately indifferent to Iriele's serious medical needs.

113.    Defendant Potter's wrongful conduct resulted from a custom or policy of refusing or delaying medical treatment to inmates at FCI Aliceville.

114.    Defendant Potter is not entitled to any form of immunity because he was not performing a legitimate job-related function through means that were within their power to utilize. Defendant Potter did not have discretion to deny an inmate necessary medical care that would have saved her life.

115.    At the time of this incident, it was clearly established that deliberate indifference to serious medical needs of an inmate is a violation of the Eighth Amendment. As such, Defendant Potter is not entitled to immunity.

116.    As a direct and proximate result of Defendant Potter's deliberate indifference, Iriele was subjected to unnecessary and wanton pain, and emotional and physical injury that resulted in death.

*Defendant Officer Jones*

117.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 14-65 above.

24

118.    Defendant Officer Jones, despite directly observing Iriele's obvious and serious medical condition—not once, but twice—disregarded her serious medical need and unilaterally concluded that there was no emergency and turned the emergency alarm off. Officer Jones, in taking no action or taking clearly inadequate, cursory action so as to amount to no treatment, prevented Iriele from receiving necessary and appropriate treatment and care, and was so grossly incompetent and inadequate as to shock the conscience.

119.    Defendant Officer Jones knew of the risk of serious harm to Iriele when he was made aware that she exhibited signs of a serious medical need after her cellmate's complaints and after seeing Iriele collapsed on the floor, yet disregarded that risk by failing or refusing to provide care, delaying care, providing grossly inadequate care, an easier but less effective course of treatment, or cursory care that amounts to no treatment at all. *See Magwood v. Sec'y. Fla. Dep't of Corr.,* 652 F. App'x 841, 844 (11th Cir. 2016). Had it not been for Officer Jones' repeated, callous derelictions of duty, Iriele would be alive today.

120.    Deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment.

121.    Iriele had – as do all inmates in the custody of the BOP have - a clearly established right under the Eighth Amendment to the United States Constitution not to be subjected to cruel and unusual punishment while incarcerated.

122.    Deliberate Indifference to a serious medical need is not a legitimate form of punishment, it is not an ancillary component of any prison sentence, and it serves no legitimate purpose.

123.    Defendant Officer Jones violated Iriele's rights by repeatedly and deliberately failing to alert medical personnel of her serious medical condition.

124.    Defendant Officer Jones failed in his duty to provide Iriele with constitutionally safe and secure conditions of confinement by subjecting her to deliberate indifference of her serious medical needs.

125.    Defendant Officer Jones had subjective knowledge of the substantial risk of serious harm to Iriele if she did not receive medical treatment and/or attention. However, he responded with deliberate indifference to that risk and denied or delayed Iriele medical treatment that could have saved her life.

126.    Defendant Officer Jones' conduct, or lack of response, constituted more than gross negligence, but was reckless and deliberately indifferent to Iriele's serious medical needs.

127.    Defendant Officer Jones' wrongful conduct resulted from a custom or policy of refusing or delaying medical treatment to inmates at FCI Aliceville.

128.    Defendant Officer Jones is not entitled to any form of immunity because he was not performing a legitimate job-related function through means that were within their power to utilize. Defendant Officer Jones did not have discretion to deny an inmate necessary medical care that would have saved her life.

129.    At the time of this incident, it was clearly established that deliberate indifference to serious medical needs of an inmate, such as denying or delaying medical treatment to an inmate in

a serious medical condition, for instance, lying collapsed on the ground, is a violation of the Eighth Amendment. As such, Defendant Officer Jones is not entitled to immunity.

130.    As a direct and proximate result of Defendant Officer Jones' deliberate indifference, Iriele was subjected to unnecessary and wanton pain, and emotional and physical injury that resulted in death.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Honorable Court grant him the following relief:

1. Compensatory damages;

2. Punitive damages;

3. Attorneys' fees and costs; and,

4. Such other further relief as this Court deems just.

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY ON**

**ALL ISSUES TRIABLE BY JURY**

Respectfully submitted,

*/s/Nicki L. Lawsen*
Samuel Fisher
Sidney M. Jackson
Nicki L. Lawsen
*Attorneys for the Plaintiff*

27

**Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC**
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
Telephone: (205) 314-0500
Facsimile: (205) 254-1500
sjackson@wigginschilds.com
sfisher@wigginschilds.com
nlawsen@wigginschilds.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system which provides electronic notice of filing to all counsel of record.

This the 5th day of January, 2024.

*/s/Nicki L. Lawsen*

OF COUNSEL